Jeff PAVLIK, Appellant,

v.

CARGILL, INC., Appellee.

No. 92–3112.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1993.

Decided Nov. 18, 1993.

James G. Lingle, Rogers, AR, argued, for appellant.

Thomas A. Mars, Springdle, AR, argued, for appellee.

Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BOWMAN, Circuit Judge.

Jeff Pavlik appeals the District Court's[1] entry of judgment as a matter of law for Cargill, Inc., on Pavlik's Racketeer Influenced and Corrupt Organizations (RICO) claims, 18 U.S.C. §§ 1961–68 (1988 & Supp. III 1991), and the court's entry of judgment on a jury verdict finding in favor of Cargill on Pavlik's claims of violation of the Packers and Stockyards Act, 7 U.S.C. § 192 (1988 & Supp. IV 1992), and on his claims of common law fraud and breach of contract. We affirm.

Pavlik raised turkeys for Cargill from 1985 until 1990 under a series of one-year contracts. Pavlik's turkey farm in Washington County, Arkansas, was a three-stage operation by the time his contract was terminated in 1990, accommodating turkeys at three different ages, in separate buildings, from newly-hatched to market-ready. The farm provided turkeys to Cargill's Springdale, Arkansas, turkey processing plant in an integrated operation: Cargill provided the newly-hatched turkeys, or poults, and brood litter for them; the feed for all turkeys; any necessary medication; delivery of the poults; and pick-up of the market-ready turkeys. Cargill also provided support and technical advice to Pavlik and its other growers through its staff of flock supervisors and growout managers, who visited the farms on a regular basis. Labor and other overhead costs, such as building maintenance and utilities, were Pavlik's responsibility. Pavlik was paid a sum for each turkey delivered to the plant, calculated using a formula that considered final weight; final number of live turkeys delivered to the plant compared with the number of live poults delivered, accounting for condemnation of turkeys that may have arrived live at the plant but could not be processed; and feed and medicine used.

During Pavlik's first two years as a turkey grower for Cargill, Pavlik ranked as one of the better growers in his growers' group (other growers who started poults in the same month). After 1986, his rankings slipped and steadily declined until he was ranked at or near the bottom. By letter dated August 1, 1990, Cargill put Pavlik on probation. In September 1990, Dale Young, Cargill's growout manager overseeing the Pavlik farm, clubbed to death nearly 700 market-ready turkeys that, according to Young, showed the classic signs of botulism. Shortly thereafter, Cargill terminated its contract with Pavlik, stating that Pavlik's bad management practices had resulted in serious disease problems and excessive mortality among Pavlik's turkeys, and overall poor performance of his flocks. As of trial, Pavlik was not growing turkeys for any other company and had been unable to sell his farm.

Pavlik's complaint alleged breach of contract, fraud, breach of fiduciary duty, interference with contractual relations and business expectancy, conversion, engaging in discriminatory or deceptive practices in violation of the Packers and Stockyards Act and conspiring to do so, and engaging in a pattern of racketeering activity (mail and wire fraud) and receiving income from the con-

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

tinuing criminal enterprise (the RICO violations). Pavlik sought common law punitive damages in addition to those available under RICO. Pavlik says Cargill short-counted and underweighed his finished turkeys, and shorted him on feed deliveries. He claims he was given inferior poults because of his complaints about shortages and because of his attempt at a Cargill growers' meeting to get the names and addresses of other growers. Pavlik contends that the retaliation escalated as he continued to complain. Pavlik says he used insurance proceeds to rebuild some of his turkey houses lost in an ice storm in early 1989 only because Cargill encouraged him to do so (although the evidence shows otherwise), even though Cargill knew at the time that it would not renew Pavlik's contract. He also asserts that his turkeys were not diseased in September 1990, or at least not to the extent alleged by Cargill, and that Young maliciously culled the 700 birds without cause. Finally, Pavlik believes that, since the termination of his grower contract, Cargill has conspired with other companies that contract with turkey growers, with real estate agents, and with others to see to it that Pavlik was unable to get another contract to grow turkeys and that he would be unable to sell his farm (which actually was first listed for sale before his Cargill contract was terminated).

## I.

■ For his first issue on appeal, Pavlik contends that the District Court erred when it ordered protection for a document the court determined to be privileged. Known as document 155, the single page contains the handwritten notes of Elizabeth Buchanan, Cargill's live production coordinator for the Springdale plant, memorializing her telephone conversation with Brian Pioske in Cargill's Minneapolis office, then a recent law school graduate who had taken the bar exam but had not yet been admitted to the bar, now in-house counsel for Cargill. The notes are undated but, according to the record, they reflect a conversation that took place shortly before Pavlik's contract was terminated. The notes read as follows [2]:

> Jeff Pavlik—Brian does not agree with provisions of Dale's letter

Options

> (1) Use Paragraph 18—of Standard terms & *terminate immediately* & remove flock—and do not place last flock We do not have flexibility of giving him an extension—of 7 days etc. or whatever & allowing him to comply & *NOT* place last flock

> (2) Give him time period to comply—if he doesn't comply Invoke paragraph 18

> *But* if he does comply we will *Have* to place the last flock—

> **Cannot discriminate against Jeff— Can only use Paragraph 18 if the conditions are *worse* here than *any* other grower—**

> Brian will be in from 4:30—5:30 pm

Pursuant to a discovery request from Pavlik, Cargill produced document 155 with approximately 300 others in November 1991 after those documents were reviewed by Cargill's retained Arkansas counsel and by various Cargill employees—excluding Brian Pioske and Elizabeth Buchanan. In counsel's affidavit, he says he thought the reference to "Brian" in the note was to Bryan Delozier, Pavlik's last flock supervisor. After a meeting on March 11, 1992, at which Buchanan was present, counsel discovered that document 155 was actually her notes of legal advice given by Pioske. On that day, and by follow-up letter of March 16, Cargill notified Pavlik that Cargill believed that document 155 was a privileged attorney-client communication inadvertently produced. On March 23, Cargill moved to protect the document as privileged. The District Court issued an order granting the motion and requiring that the document be returned and that its contents be neither disclosed nor used. The court also granted Cargill's motion for a protective order filed upon Pavlik's notice to depose Pioske.

---

2. The portion of the note shown here in boldface appears to have been highlighted on the copy of the note provided to this Court in the Appellant's Appendix. There is no indication in the record who may have marked the document in that manner.

Pavlik contends that the court's ruling allowing withdrawal of document 155 constituted error, for a variety of reasons: the document was not privileged in the first instance because Buchanan was not an attorney, and neither was Pioske at the time the notes were taken; production of the document was not inadvertent; regardless of the circumstances under which the document was produced, the privilege was waived once the document was produced; and the document was made in furtherance of a fraud and therefore is not privileged under Arkansas law. Pavlik further argues that, in any event, the document should have been received to rehabilitate Pavlik after cross-examination made it appear he had no rational basis for the belief that Cargill was conspiring against him. As for the court's decision to forbid the deposition of Pioske, Pavlik claims Pioske had an active role in terminating the contract and therefore Pavlik should have been permitted to depose him.

The issue of whether documents claimed to be privileged may be withdrawn when they are inadvertently produced in discovery is a question of first impression in this Circuit. Courts in other jurisdictions reaching the question have adopted three positions: there is no waiver of the privilege if the document is inadvertently produced because the privilege must be knowingly waived; the privilege is always waived even if the document is inadvertently produced because the confidentiality is lost once the document is produced; or the privilege may or may not be waived depending upon the results of an ad hoc balancing test that considers the precautions taken to prevent inadvertent disclosure, the number of such disclosures, the extent of the disclosure, the steps taken to remedy the disclosure and the timeliness with which they were taken, and whether or not justice would be served by protecting the document. *See, e.g., In re Grand Jury Investigation*, 142 F.R.D. 276, 278–79 (M.D.N.C.1992) (discussing all options).

We find it unnecessary to decide whether document 155 was privileged, whether it was inadvertently produced, or the consequences of inadvertent disclosure. Having studied document 155, and the record of trial, we conclude that any error in the court's order allowing withdrawal (and *ipso facto* the court's failure to admit the document into evidence) was clearly harmless. Frankly, it is not clear to us why Cargill fought so hard to protect these innocuous notes.

The notes express Cargill's obligations to Pavlik under the contract, and explain the perfectly legitimate options for termination that are Cargill's under the contract.[3] Rather than showing a discriminatory intent or a conspiracy against Pavlik, the notes indicate that Cargill was making every effort to avoid discriminating against Pavlik and to prevent Cargill employees from taking any action that would violate either the terms of the contract or the law. The court received as exhibits the drafts of Pavlik's termination letter, including the first draft that was not sent and upon which Pioske was commenting when Buchanan took the notes in document 155. Further, the court permitted testimony about why the first letter was not sent, who was involved in the decision not to send it, how it differed from the letter that was sent, and who had a hand in editing it—including Brian Pioske. We also find no merit to Pavlik's contention that the notes were made in furtherance of a fraud. The jury concluded there was no fraud and after our review of the record we must agree. We hold that any error in protecting the document was harmless.

Pavlik's contention that the notes should have been received to rehabilitate him, to make him appear less paranoid by demonstrating another individual's (Pioske's) involvement in the alleged conspiracy does not change our view that any error in protecting the document was harmless. There was testimony about Pioske's involvement in drafting Pavlik's termination letter, and Cargill never attempted to deny or refute Pioske's role in terminating Pavlik. Finally,

---

**3.** The notes reference paragraph 18, which is one of the standard terms of the grower's contract. Paragraph 18 permits Cargill to terminate the contract immediately if the grower fails to care for the turkeys using ordinary and reasonable skill. Pavlik's contract was terminated pursuant to this provision.

we hold that the protective order issued to prevent the deposition of Pioske was not error, given Pioske's role as counsel for Cargill in this litigation. The trial court has broad discretion to decide discovery motions and we will not disturb such a ruling absent a gross abuse of discretion affecting the fundamental fairness of the trial. *Lee v. Armontrout*, 991 F.2d 487, 489 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 209, 126 L.Ed.2d 166 (1993). We find no such abuse here.

## II.

■ Pavlik also argues that he should have been permitted to introduce as an exhibit a preliminary injunction granted by a federal district court in Florida in an unrelated case against Cargill that concerned the alleged unlawful termination of a broiler growers' association president. Pavlik argues that, because he had seen the document, it would have made his testimony regarding Cargill's alleged conspiracy against him appear less paranoid had he been able to use the preliminary injunction as evidence.

We review this evidentiary ruling for abuse of the District Court's discretion. *See Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir.1993). A preliminary, not permanent, injunction from another district, involving a chicken grower whose contract (the terms of which we do not know) allegedly was terminated for motivations not seriously suggested, and certainly not proved, in this lawsuit, with no evidence that the Cargill employees involved in the two terminations overlapped at any level, clearly was irrelevant to the issues raised in Pavlik's case. We hold that the District Court did not abuse its discretion in concluding the injunction was irrelevant to Pavlik's case and refusing to admit it into evidence.

## III.

■ Pavlik next argues he is entitled to a new trial because of improper comments in closing argument made by Cargill's counsel. Specifically, Pavlik challenges the reference to Pavlik's "finding a lawyer in the summer of 1991 that wanted to sue a big company." Transcript Vol. V at 90. This was the only portion of the closing argument to which Pavlik objected. Although it is clear from the transcript that the objection was withdrawn, the District Court nevertheless ruled on Pavlik's objection.

**COUNSEL FOR PAVLIK:** Your Honor, I object to that.

**THE COURT:** Well, do you have grounds?

**COUNSEL FOR CARGILL:** Well, there was some testimony about this.

**COUNSEL FOR PAVLIK:** Oh, was there?

**THE COURT:** Do you have grounds?

**COUNSEL FOR PAVLIK:** Who is the lawyer? I'll let it go.

**THE COURT:** The objection is overruled. I give a great deal of leeway on closes. The Court has already told the jury that the lawyer's statements are not evidence; they're not facts. You may decide the case based on the facts and the law.

*Id.* at 90–91.

Having considered the entire closing argument in the context of the testimony at trial, we conclude that the court did not err in overruling Pavlik's objections, as the challenged statement was not "plainly unwarranted and clearly injurious." *Scott v. James*, 902 F.2d 672, 674 (8th Cir.), *cert. denied*, 498 U.S. 873, 111 S.Ct. 198, 112 L.Ed.2d 160 (1990). This is especially true in view of the court's instruction to the jury that the closing arguments were not evidence.

■ Pavlik made no objections to the other comments he now finds objectionable: that Pavlik made sure there was a reporter at trial all week; that Cargill chose not to settle although it could have done so to avoid bad publicity; that Pavlik was unprepared to go to trial because he had expected Cargill to settle; that Cargill hired an investigator who, "after digging up every piece of dirt that he can on Cargill," located only six unhappy Cargill turkey growers out of 120 possibilities; and that, if the jury found Cargill liable, the Cargill employees who testified at the trial would have to explain to family and friends that the jury found them to have

committed federal crimes. Because Pavlik made no contemporaneous objections to these statements, his objections presently raised in this Court are not properly before us, and our review is only for plain error. *See Manning v. Lunda Constr. Co.*, 953 F.2d 1090, 1093 (8th Cir.1992) (per curiam). We find none.

### IV.

■ Pavlik next argues that he was entitled to a continuance because some Cargill documents were not produced until the trial began. The documents in question listed flock performance data and, according to the unrebutted testimony at the hearing on Pavlik's motion to compel production, for sanctions, and for a continuance, the data were compiled from the same information that was timely produced earlier in the litigation. The only information that apparently was available only from the undisclosed documents, and not found in the other documents Cargill produced, included Cargill's real cost, the breed of turkey poults given to growers, and "converted" feed and age figures.

After the hearing, the District Court concluded that the failure to produce the documents was not willful and that the relevance of the documents was questionable at best. The court denied sanctions, ordered production of the documents, and denied the request for a continuance. The trial began Monday, June 8, 1992, the documents were produced Tuesday by 9:00 p.m., and the trial concluded on Friday, June 12. After Tuesday, Pavlik gave no indication to the court that he was experiencing any difficulty getting through the documents, nor did he renew his request for a continuance—a step one presumably would take if, after looking at the documents, it became apparent they were relevant to the case *and* could not be dissected before the end of the plaintiff's case. There is no indication in the record that Pavlik experienced any sort of a time crunch vis-a-vis the documents after they were produced, much less one necessitating a continuance. We have looked at a sample of these documents and it seems that, in fact, the documents were not "earth shattering," as the District Court opined when making its ruling. Transcript Vol. I at 25. We hold that the District Court did not abuse its discretion in denying the requested continuance. *See Swindler v. Lockhart*, 885 F.2d 1342, 1350 (8th Cir.1989), *cert. denied*, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).

### V.

■ Finally, Pavlik contends that the District Court erred in granting Cargill's motion for judgment as a matter of law on Pavlik's RICO claims. The court found insufficient evidence to conclude that any reasonable jury could find, by a preponderance of the evidence, that Cargill had committed civil RICO violations and granted Cargill's motion. In our de novo review, we view the evidence in the light most favorable to Pavlik and we do not judge the credibility of the witnesses. *See Johnson v. Cowell Steel Structures, Inc.*, 991 F.2d 474, 478 (8th Cir. 1993). We have considered the evidence Pavlik claims supports his allegation of RICO violations (indeed, we have reviewed the entire transcript for such evidence) and we hold that judgment as a matter of law was properly granted. The prohibited activities under RICO that Pavlik alleges all require proof of "a pattern of racketeering activity." 18 U.S.C. § 1962 (1988); *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). To prove a pattern of racketeering activity, Pavlik "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900. Without even considering whether the alleged predicate acts of mail and wire fraud were proved (and we have our doubts that they were), we can say without question that Pavlik did not prove the requisite relatedness and continuity. The District Court did not err in granting Cargill judgment as a matter of law on Pavlik's RICO claims.

Finding no merit to any of the issues raised by Pavlik in this appeal, we affirm the judgment of the District Court.